IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

LESLIE LYNN BAKER                                          PLAINTIFF

V.                            NO. 10-5249

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration        DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Leslie Lynn Baker, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claims for a period of disability and disability insurance benefits (DIB) and supplemental security income (SSI) benefits under the provisions of Titles II and XVI of the Social Security Act (Act).[1]  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  See 42 U.S.C. § 405(g).

## I.      Procedural Background:

Plaintiff protectively filed his current applications for DIB and SSI on October 8, 2008, alleging an inability to work due to a back injury.  (Tr. 142,157). An administrative hearing was held on September 30, 2009, at which Plaintiff appeared with counsel and testified.  (Tr. 45-74).

By written decision dated March 19, 2010, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe -

---

[1]Although Plaintiff applied for both DIB and SSI, the ALJ's decision addresses only the DIB application. In the brief, Plaintiff's attorney states that Plaintiff initiated this action for a judicial determination of his eligibility for DIB and SSI.  However, no further mention of SSI benefits was made. The ALJ's analysis of Plaintiff's DIB application would apply equally to Plaintiff's SSI application.

-1-

degenerative disc disease of the lumbar spine.  (Tr. 24).  However, after reviewing all of the evidence presented, she determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4.  (Tr. 24).  The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform less than the full range of light work as defined in 20 CFR 404.1567(b) except that he can do no climbing of ladders, ramps and scaffolds and only occasionally can climb ramps, stairs, balance, stoop, kneel, crouch, and crawl.  Additionally, the claimant only frequently can push and pull with the lower left extremity.

(Tr. 25).  With the help of a vocational expert (VE), the ALJ determined Plaintiff could perform other work as a cashier, housekeeper, and hand packager.  (Tr. 29).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on October 26, 2010.  (Tr. 1-4).  Subsequently, Plaintiff filed this action. (Doc. 1).  This case is before the undersigned pursuant to the consent of the parties.  (Doc. 7). Both parties have filed appeal briefs, and the case is now ready for decision.  (Docs. 13, 14).

## II.   Evidence Presented:

Plaintiff was born in 1966, and completed the twelfth grade in school.  (Tr. 142, 163). He worked as a mechanic for a car dealer from 1997 to 2008, and an engine builder for an engine remanufacturer for four years prior thereto.  (Tr. 165).  Between May 24, 2000 and December 27, 2002, Plaintiff was treated for various ailments, including hypertension, elevated lipids, headaches, neck pain and abdominal pain.  (Tr. 437-446).  On February 6, 2002, a renal ultrasound was performed, and on February 14, 2002, a CT of the abdomen revealed status post

-2-

cholecystectomy;[2] no evidence of a right renal mass;  no calcifications were seen on the unenhanced images;  and the CT of the abdomen was otherwise normal.  (Tr. 467).

On August 8, 2003, Plaintiff presented himself to Dr. Clinton C. Schmidt for evaluation of stress.  Dr. Schmidt's impression was anxiety/stress/probable depression, and he prescribed Lexapro for Plaintiff.  (Tr. 436).  On August 29, 2003, when Plaintiff next saw Dr. Schmidt, he reported to Dr. Schmidt that the Lexapro really seemed to be beneficial.  (Tr. 434).

On January 29, 2004, Plaintiff saw Dr. Schmidt, and reported that he had been under a lot of stress and had responded well to Lexapro, 10 mg. a day.  (Tr. 432).  However, his wife reported that one of the side effects was that he was too complacent.  The impression was:

1. Elevated lipids
2. Hypertension - fairly well controlled
3. Umbilical hernia
4. He has had some anxiety

(Tr. 433).

On March 2, 2005, Plaintiff presented himself to Dr. Stephen P. Johnson at the Fayetteville Diagnostic Clinic, with high blood pressure, and wanted to get back on Lexapro. (Tr. 431).  Thereafter, on March 8, 2005, Plaintiff began being treated by Dr. David W. Clay of the Fayetteville Diagnostic Clinic, for a followup of his blood pressure.  Dr. Clay's impression was hypertension and hyperlipidemia.[3]  (Tr. 430).  On March 23, 2005, Dr. Clay reported that Plaintiff had tolerated his Enalapril and Tricor well.  (Tr. 428).  On September 14, 2005, Plaintiff

---

[2]Cholecystectomy - Surgical removal of the gallbladder.  Dorland's Illustrated Medical Dictionary 354 (31st ed. 2007).

[3]Hyperlipidemia - A general term for elevated concentrations of any or all of the lipids in the plasma, such as hypertriglyceridemia, hypercholesterolemia, and so on. See also table of hyperlipoproteinemias.  Called also hyperlipemia, lipemia, and lipidemia.  Id. at 903.

AO72A
(Rev. 8/82)

presented himself to Dr. Clay for followup of his hypertension and hyperlipidemia. Dr. Clay reported that Plaintiff had no complaints. (Tr. 427). At that time, Plaintiff was taking Hydrochlorothiazide, Tricor, Lisinopril, and Lexapro. (Tr. 427).

On February 3, 2006, Dr. Clay found that Plaintiff had an umbilical hernia and left inguinal hernia, and also had symptoms consistent with plantar fasciitis. (Tr. 347). On February 27, 2006, surgeon Anthony Burton performed surgery, repairing Plaintiff's inguinal hernia with mesh and repaired the left inguinal hernia with mesh. (Tr. 309). No granuloma nor malignancies were found. (Tr. 313).

On February 8, 2007, Plaintiff sustained a back injury at work and on February 9, 2007, a Lumbar Spine MRI was performed at Northwest Arkansas Medical Imaging, Inc. (Tr. 203-204, 216-217, 282-283). The impression was:

1. Left parasagittal disc protrusion of the L4-5 level results in some left lateral recess narrowing. This is contiguous with the left L5 nerve root. No nerve root enlargement is demonstrated.

2. No disc extrusion, central canal stenosis or severe neural foraminal stenosis is demonstrated.

3. Facet hypertrophy. No asymmetric fluid or synovial cyst is demonstrated.

4. Conus medullaris appears unremarkable. No intradural mass is demonstrated.

5. Marrow signal appears unremarkable.

6. Minimal annulus bulge of the L5-S1 level without mass effect on the thecal sac.

7. Minimal annulus bulge of the L3-4 level without significant mass effect on the thecal sac.

(Tr. 204). Plaintiff sought treatment from a chiropractor (Tr. 214-215, 218), and on February 29, 2007, was seen by Dr. Cathleen E. Vandergriff, of the Arkansas Occupational Health Clinic,

-4-

where he was assessed with a lumbar strain. (Tr. 257). Dr. Vandergriff recommended physical therapy, and reported that Plaintiff had a very good prognosis and "may return to work today with no lifting greater than 10 pounds as well as no pushing or pulling greater than 10 pounds." (Tr. 257).

Plaintiff underwent physical therapy between February 26, 2007 and April 6, 2007, with little results. (Tr. 223-224, 227, 229, 233, 235-237, 279-280). On March 28, 2007, Plaintiff presented himself to Washington Regional Medical Center, complaining of right knee pain. (Tr. 330). He was diagnosed with right knee strain. (Tr. 332). An x-ray of his knee revealed no fracture. (Tr. 336). On April 3, 2007, Dr. Vandergriff sent a letter to Plaintiff's employer, assessing Plaintiff with lumbar strain, and reporting that Plaintiff had two rounds of physical therapy without improvement and that his MRI did not really show very significant findings. (Tr. 251). She believed that she had helped him as much as she could, and referred him to neurosurgery for further evaluation and treatment. (Tr. 251). On April 4, 2007, Dr. Vandergriff opined that Plaintiff could return to work with the same restrictions as previously given. (Tr. 247-248).

On April 13, 2007, Dr. Vandergriff reported that she received a call from the insurance company wanting causation addressed regarding Plaintiff's reported right knee pain and swelling. (Tr. 245). Plaintiff had reported that when he went to the hospital with right knee pain, the ER doctor said his right knee pain was caused by compensation in his gait due to his back pain. Dr. Vandergriff observed that Plaintiff had swelling and warmth in his right knee, but, in her experience with lumbar strains, "I have not had knee complications of swelling and warmth as reported and seen in Mr. Baker today. Therefore, I would not relate his right knee pain and

-5-

swelling specifically due to his lumbar strain although it could be a possibility." (Tr. 245).

On April 25, 2007, Dr. Vandergriff wrote another letter to Plaintiff's employer, assessing Plaintiff with "right knee pain/swelling-resolving well." (Tr. 244). She noted that since Plaintiff wanted to make sure he was 100% better, she could send him to physical therapy for his knee. She noted that Plaintiff had been released from her care regarding the back issue, and was seeing a neurosurgeon (Dr. Rodney T. Routsong) for his back. (Tr. 244).

On May 7, 2007, a lumbar myelogram revealed an appearance of disc herniation of the left side producing mild effacement of the L5 nerve root, and a CT of the lumbar spine revealed a small disc herniation present on the left side at L4-5, impinging the left L5 nerve root. (Tr. 290-291).

On June 8, 2007, Dr. Routsong, from Northwest Arkansas Neurosurgery Clinic, P.A., sent a letter to Dr. Vandergriff, reporting that he told Plaintiff that surgery would not help his low back complaint, but that they had discussed treatment alternatives for his nerve problem, including surgical nerve decompression. (Tr. 271). On July 2, 2007, Dr. Routsong wrote another letter to Dr. Vandergriff, stating that he was concerned about Plaintiff's muscle atrophy and further weakness and numbness in the left lower extremity, asking Plaintiff again to think about surgical nerve decompression. (Tr. 270). On July 17, 2007, upon physical examination of Plaintiff by Dr. Routsong, Plaintiff's gait was hesitant, and Dr. Routsong gave Plaintiff a prescription for Flexeril, 5 mg. in the evening to help him rest. (Tr. 269).

On August 9, 2007, Dr. Routsong reported to Dr. Vandergriff that examination revealed Plaintiff was demonstrating some slow improvement in regard to sacroiliac somatic dysfunction, and that Plaintiff was beginning to think about surgery for his nerve problem. (Tr. 268). By

-6-

August 23, 2007, Plaintiff reported to Dr. Routsong that his pain had "plateaued" off, and that he still had daily and nightly pain at the left sacroiliac and tingling radiating down the lateral aspect of the left leg, to the foot. (Tr. 267). The Plaintiff then advised that he would like to have surgery for the nerve problem. (Tr. 267).

At a preoperative evaluation conducted by Dr. Clay, Plaintiff had elevated blood pressure and blood sugar. However, Dr. Clay gave an impression that Plaintiff's hypertension was controlled. (Tr. 344). On October 5, 2007, Dr. Routsong performed a left L4 microlaminectomy with microdissection and partial foraminotomy and removal of herniated nucleus pulposus, L4-5, for nerve decompression. (Tr. 319).

On October 22, 2007 and November 19, 2007, Plaintiff reported to Dr. Routsong that he was happy with his improvement. (Tr. 361-362). On January 3, 2008, Plaintiff no longer described radicular pain to Dr. Routsong, and continued to demonstrate further improvement. (Tr. 360). His main complaint was that of sacroiliac pain, and Dr. Routsong opined that he was not physically capable of returning to work at that time. (Tr. 360). Plaintiff was taking Ibuprofen at home for his arthritic complaints as well as his Monopril/HCT. (Tr. 360).

On February 4, 2008, Dr. Routsong reported that Plaintiff no longer had radicular pain or numbness and that he continued to have pain at the left sacroiliac joint and occasionally in the hamstring region on the left. (Tr. 266). Dr. Routsong reported that neurologically, Plaintiff continued to do well. (Tr. 266). He also reported that Plaintiff had some recent falls and was still having sacroiliac pain and some hamstring tightness on the left, but also noted that Plaintiff had not been taking pain medicine. Plaintiff had been taking Ibuprofen 600 mg. daily and it was increased to "t.i.d.p.c." Dr. Routsong also gave Plaintiff samples for Lyrica 75 mg. "b.i.d." with

-7-

appropriate medicine information.  (Tr. 266).

On March 19, 2008, Dr. Routsong saw Plaintiff regarding ongoing difficulty with low-back pain.  Dr. Routsong noted that Plaintiff was given samples of Lyrica and decided not to use them.  (Tr. 358).  Dr. Routsong again suggested it, and again gave reasons for the medication. (Tr. 358).

On April 8, 2008, Doin Dahlke, M.Ed., ATC/L, CFE, Certified Functional Evaluator, of Functional Testing Centers, Inc., conducted a functional capacity evaluation, upon referral by Dr. Routsong.  (Tr. 393-394).  Mr. Dahlke reported that Plaintiff demonstrated the ability to perform lifting activities at the medium level with an occasional bi-manual lift of up to 60 lbs. when lifting/carrying from floor to knuckle level, and up to 50 lbs when lifting to shoulder level.  (Tr. 393).  He further reported that Plaintiff demonstrated the ability to perform the following activities on a constant basis:  reach immediate (L);  reach immediate (R);  reach overhead (L); reach overhead (R);  reach with 5 lbs. weight (L);  reach with 5 lbs. weight (R);  handling (L); handling (R);  fingering (L);  fingering (R);  and sitting and standing.  (Tr. 393).  He found Plaintiff demonstrated the ability to perform the following activities on a frequent basis:  walk; push cart;  pull cart;  balance;  crouch;  and kneel and climb stairs.  Mr. Dahlke also found that Plaintiff demonstrated the ability to carry up to 60 lbs and stoop on an occasional basis.  Mr. Dahlke found that Plaintiff demonstrated functional limitations with bi-manual material handling at the 60 lbs. level with lifting/carrying up to this amount, on an occasional basis.  (Tr. 394).  He reported that Plaintiff exhibited mildly decreased lumbar AROM and performed stooping at the occasional classification.  He further reported that Plaintiff performed all other activities at a level consistent with that of any average worker.  (Tr. 394).  "Overall, Plaintiff demonstrated the

-8-

ability to perform work in the Medium classification as defined by the US Dept. of Labor's guidelines over the course of a normal workday with the limitations above." (Tr. 394).

Mr. Dahlke also observed Plaintiff going into a full squat to do lifting from the floor level and that he lifted 50 lbs. bi-manually from knuckle to shoulder level. (Tr. 400). Mr. Dahlke reported that Plaintiff entered the office at a normal pace with normal gait pattern and was able to sit during the intake interview and during paperwork for 40 minutes before he stood for a few minutes. (Tr. 402). He noted that Plaintiff ambulated with a normal gait at a normal pace, was able to heel, toe, and side to side walk with no problems, and that his pace of movement was consistent with an average worker. (Tr. 403). He found Plaintiff was able to carry 60 lbs. bi-manually with a normal gait at a normal pace and pushed and pulled the cart in a normal fashion at a normal pace. (Tr. 404). Plaintiff demonstrated good balance and was able to stork stand on either leg, although slightly more unstable on his left compared to his right. (Tr. 404). Plaintiff was reported as completing the stooping in a modified position with bent knees and less flexion in his lumbar area, and was slower than normal and very guarded with this movement pattern. His lumbar flexion was found to be consistent with that of an average worker. Plaintiff went up and down the stairs in a normal fashion at a normal pace. (Tr. 405). Plaintiff went from sit to stand and vice versa in a normal fashion at a normal pace, keeping his back straight each time. (Tr. 407).

On June 11, 2008, Dr. Routsong saw Plaintiff regarding his previous problem of left L5 radiculopathy. Dr. Routsong stated that neurologically, Plaintiff continued to do well and noticed very minimal numbness about the left lateral calf. He still had left heel pain and left sacroiliac pain. (Tr. 265). Plaintiff's gait was normal, and he and Dr. Routsong again discussed

-9-

his back care and activity limitation instructions as well as planning and pacing of his activities. (Tr. 265). Plaintiff was taking Ibuprofen 800 mg. t..i.d.p.c. without side effects and Monopril. (Tr. 265).

On August 5, 2008, Plaintiff presented himself to Dr. Clay with an abnormal lab result from an insurance physical. (Tr. 343, 422). Plaintiff had an "elevated _____, hemoglobin A1c, LFT's, and triglycerides." (Tr. 343).

On August 28, 2008, Dr. Routsong reported that Plaintiff recently underwent several sessions of physical therapy and stated that he thought he benefitted from them. (Tr. 355). On August 29, 2008, Dr. Clay recommended an ultrasound of Plaintiff's liver, which was accomplished that same day. (Tr. 465). The impression was:

1. Probable diffuse fatty infiltration of the liver
2. Surgical absence of the gallbladder with no bile duct dilatation
3. Limited pancreatic tail evaluation due to bowel gas shadowing

(Tr. 465). On September 29, 2008, Plaintiff saw Dr. Clay for his hypertension. Dr. Clay's impression was hypertension and arthralgia. (Tr. 417).

On October 2, 2008, Dr. Routsong found Plaintiff's neurological examination was normal, that he had reached the point of maximum medical improvement, and released Plaintiff from his medical care. (Tr. 354).

On November 19, 2008, non-examining physician Dr. Jim Takach completed a Physical RFC Assessment. (Tr. 380-387). Dr. Takach found that Plaintiff could perform light work, and that he could occasionally climb ramp/stairs/ladder/rope/scaffolds, balance, stoop, kneel, crouch, and crawl. (Tr. 381-382). Dr. Takach also found that Plaintiff should avoid concentrated exposure to hazards (machinery, heights, etc.). (Tr. 384).

-10-

On June 5, 2009, Plaintiff presented himself to Dr. Clay, reporting that he had an elevated blood pressure over the weekend. (Tr. 414). He also reported having a 45 minute to 1 hour episode of expressive aphasia[4] and bilateral hand numbness. This resolved completely and he had been asymptomatic. Dr. Clay's impression was possible TIA[5] with expressive aphasia. (Tr. 414). Plaintiff was reported as having to leave before Dr. Clay was able to finalize the visit, and Dr. Clay was called by the radiologist, who was concerned there may be a 3 mm. aneurysm of the internal carotid artery at the level of the cavernous sinus on the right. (Tr. 414). Dr. Clay reported that he would notify Plaintiff and tell him to go to the hospital as soon as he received the message. (Tr. 414). On June 5, 2009, a MRI of Plaintiff's brain without contrast and intracranial MR Angiography was taken. (Tr. 419-420). The impression was:

1. Probable internal carotid artery aneurysm
2. The report was called to Dr. Clay's office

(Tr. 420). On June 6, 2009, Dr. Larry Armstrong of the Northwest Arkansas Neuroscience Institute gave the impression of "meningohypophyseal prominence," infundibulum[6] versus actual aneurysm 2 x 3 mm. in size. (Tr. 411). He recommended that Plaintiff be sent to Dr. Edward Cunningham, II, a cerebrovascular specialist, at Springfield Neurologic Institute at Cox Hospital in Springfield, and until that time, Plaintiff was to have no strenuous activity and have normal

---

[4]Aphasia - Any of a large group of language disorders involving defect or loss of the power of expression by speech, writing, or signs, or of comprehending spoken or written language, due to injury or disease of the brain or to psychogenic causes. Less severe forms are known as dysphasia. See also agrammatism, dysphasia, and paraphasia. Id. at 116.

[5]TIA - Transient ischemic attack. Id. at 1952.

[6]Infundibulum - 1. A general anatomical term for a funnel-shaped structure; called also choana. 2. i. Neurohypophyseos. 3. A downgrowth from the neuroectoderm of the embryonic diencephalon that gives rise to the neurohypophysis. 4. Conus arteriosus. 5. The deep, often tubular or funnel-shaped part of the buccal cavity seen in certain protozoa, especially peritrichous ciliates. Id. at 952.

function and activities of daily living without anything strenuous.  (Tr. 411).

On June 29, 2009, Dr. Cunningham saw Plaintiff.  (Tr. 471).  His impression was possible small aneurysm, and he recommended that they obtain a second CD.  (Tr. 475).  Dr. Cunningham further stated that the diagnosis of aneurysm "(whether it is there or not) has no impact on disability."  (Tr. 475).  In that same report, Plaintiff denied having depression.  (Tr. 471).  Another report of Dr. Cunningham's dated July 8, 2009, indicates that he reviewed the MRA(magnetic resonance angiogram) on the second CD and that there was a small lift ICA[7] aneurysm along the cavernous segment that was projecting medially, though not into the "hypaphyseal fossa." (Tr. 475).  Dr. Cunningham reported that this aneurysm did not pose a risk of "SAH or death."  "At worst, the pt. would suffer a cavernous sinus syndrome which is not life threatening but could cause visual loss if not addressed in a timely fashion.  My nurse will discuss this with the pt. by phone.  He does not need follow-up imaging for this." (Tr. 475).  Plaintiff was contacted with the results and was instructed to work out as he normally would and to continue to live a healthy lifestyle.  (Tr. 475).     On July 17, 2009, Plaintiff presented himself to Dr. Clay with back pain.  (Tr. 413).

After the ALJ's decision dated March 19, 2010, Plaintiff was seen by Dr. Joel A. Price on May 3, 2010.  (Tr. 12-13).  Dr. Price diagnosed Plaintiff as follows:

| | |
|---|---|
| Axis I: | Mood D/O secondary to CVS 293.83(?)[8]<br>IED[9] |
| Axis II: | Def. |

---

[7]ICA - Abbreviation for internal carotid artery.  Stedman's Medical Dictionary 942 (28th ed. 2006).

[8]The Court is unsure of the definition of CVS, but speculates it refers to cardiovascular system in this context.

[9]The Court also believes this refers to intermittent explosive disorder.

Axis III:      CVS
Axis IV:      Primary Support
Axis V:      GAF - 50

(Tr. 13).  At that time, Plaintiff's medications were listed as Prozac, Trileptal, and Ativan.  (Tr.

14).  Dr. Price also reported that Plaintiff was able to work and wanted to work, and that Plaintiff

suffered from depression.  (Tr. 17).  In a May 17, 2010 letter from Dr. Price to Plaintiff's

attorney, Dr. Price advised that Plaintiff was diagnosed with Mood Disorder (293.83), and

advised the attorney of his current medications.  (Tr. 11).

          In a Report of Pain and other Symptoms dated October 29, 2008, Plaintiff reported that

he had daily chronic pain located in his lower back and left leg, which interfered with his sleep

and was worse when he stood or sat for long periods of time or upon bending or lifting.  (Tr.

145).  He reported that he could stand/walk 8 hours a day and could sit with no real limitations.

(Tr. 145).  He further reported that bending, twisting, lifting, sitting long periods, and standing

long periods made his pain worse.  (Tr. 146).  He noted that heat and a TENS unit helped him

and that he was taking Ibuprofen - 800 mg. for pain. (Tr. 146).  In a Function Report of the same

date, Plaintiff reported that on a daily basis, he got dressed, drove his wife to work; dropped his

son off at school; dropped his daughter off at day care; returned home; watched television; did

a few household chores (washed dishes, dusted); checked mail; paid bills; picked everyone up

from school, work and daycare; came home and helped assist with meal preparation; helped with

homework; watched television; and went to bed.  (Tr. 147).  He reported that he had no problems

with personal care, and that he worked on the household chores off and on all day.  (Tr. 149).

He reported that he went outside daily, drove a car, shopped for family and household items, and

was able to handle money.  (Tr. 150).  He also reported that he could walk about 15 minutes

-13-

before feeling the need to rest, and could pay attention for 10-15 minutes. (Tr. 152). He used the TENS unit daily. (Tr. 153). He reported that he had begun to feel more depressed lately since he was realizing that he would no longer be able to engage in his favorite past times (working on old cars, gardening), and since he lost his job due to the injury. (Tr. 154).

In an undated Disability Report, Plaintiff noted that the condition that limited his ability to work was "Back injury." (Tr. 157). He reported that he was not able to twist or lift over 50 lbs. and could not continue lifting and bending over or stand or sit for very long. (Tr. 157).

At the hearing held on September 3, 2009, Plaintiff reported that he had three children, ages 19, 7, and 3, and that in a normal day, he took his daughter to day care, swept, vacuumed, did the dishes, picked up his daughter, and shared in making dinner with his wife. (Tr. 57-58). He reported that the neurosurgeon in Springfield, Missouri said that his aneurysm was at a point where "it's at the edge of being operable, where they can come in and put a clamp or something around it" and that it was too small at this point, so they were going to monitor it. (Tr. 60). He also testified that his blood pressure was pretty reasonably controlled. (Tr. 61). He reported taking Ibuprofen - 800 milligrams. He was told that he had an abnormal liver test and that it was determined it was because he was taking too much ibuprofen. He stated that he was "not taking anything else now." He further stated that he had not talked to his doctor about any other medications. "I just kind of live with the pain. Of course, the less I do, the more sitting around all day is all I do." (Tr. 64). Plaintiff testified that a doctor had given him medication for depression, "but I have not been technically diagnosed with it." (Tr. 65). He stated that he was not still taking that medication because "it would make me sick in my stomach most of the time, and I didn't like how I felt on it." (Tr. 65).

-14-

III.    **Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  <u>Ramirez v. Barnhart</u>, 292 F. 3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  <u>Edwards v. Barnhart</u>, 314 F. 3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  <u>Haley v. Massanari</u>, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  <u>Young v. Apfel</u>, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  <u>Pearsall v. Massanari</u>, 274 F. 3d 1211, 1217 (8th Cir. 2001); <u>see</u> <u>also</u> 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§423(d)(3), 1382(3)(D).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

-15-

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing his claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given his age, education, and experience.  See 20 C.F.R. §416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity (RFC).  See McCoy v. Schneider, 683 F.2d 1138, 1141-42 (8th Cir. 1982);  20 C.F.R. §416.920.

**IV.    Discussion:**

In his brief, Plaintiff raises the following issues on appeal: 1) The ALJ neglected to discuss Plaintiff's diagnosed depression in any detail;  2) The ALJ failed to properly analyze Plaintiff's subjective complaints of pain; 3) The ALJ erred in determining that Plaintiff retained the RFC to perform less than a full range of light work;  4) The ALJ neglected to fully and fairly develop the medical record by failing to adequately evaluate all of Plaintiff's subjective claims and medical diagnoses, specifically Plaintiff's depression.[10]

**A.    Non-Severity of Depression:**

In her decision, the ALJ reported that although Plaintiff's attorney referenced treatment prior to the alleged onset date for depression, "there has been no ongoing treatment for any mood disorder, or for that matter, any treatment at all since 2003."  (Tr. 24).  She further stated that

---

[10]The Court will discuss this when discussing the first issue on appeal.

-16-

Plaintiff did not take any psychotropic medication and that his past treatment record did not

reflect any ongoing or current issues with regard to depression.  The ALJ further stated:

> Noteworthy is that in a report date October 1, 2009 that the claimant specifically denied
> any psychiatric issues, although he may have done so elsewhere, he certainly did not in
> the report of October 1, 2009.

(Tr. 24).

An impairment is severe within the meaning of the regulations if it significantly limits

an individual's ability to perform basic work activities. 20 C.F.R.  §  §  1520(a)(4)ii),

416.920(a)(4)(ii).  An impairment or combination of impairments is not severe when medical

and other evidence establish only a slight abnormality or a combination of slight abnormalities

that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. §

§ 404.1521, 416.921.  The Supreme Court has adopted a "de minimis standard" with regard to

the severity standard.  Hudson v. Bowen, 870 F.2d 1392, 1395 (8th Cri. 1989).

A review of the records indicates that Plaintiff's depression was noted or discussed in

2004, and nothing further was noted or discussed with respect to depression until October 29,

2008, when he reported in a social security report that he had "begun to feel more depressed

lately."  However, in his undated Disability Report - Adult, he claimed that the only condition

that prevented him from working was his back injury.  Furthermore, Plaintiff admitted that he

had been prescribed medication for his depression, but did not take it because he did not like the

way it made him feel. (Tr. 65).  He further admitted that he had not discussed any other

medications with his doctor.  Finally, as noted by the ALJ, when Plaintiff was seen by Dr.

Cunningham on June 29, 2009, he denied having any problems with depression.

The Appeals Council noted that they looked at the medical records from Joel A. Price,

-17-

AO72A
(Rev. 8/82)

M.D. dated May 3, 2010, wherein he diagnosed Plaintiff with mood disorder, and that Plaintiff was taking Prozac at that time. (Tr. 2, 11-18). The Appeals Council noted, however, that the ALJ decided his case through March 19, 2010, and that the new information did not affect the decision about whether Plaintiff was disabled based on depression beginning on or before March 19, 2010. (Tr. 2). The Appeals Council further stated: "If you want us to consider whether you were disabled after March 19, 2010, you need to apply again." (Tr. 2).

The Court finds that there is substantial evidence to support the ALJ's finding that Plaintiff's depression was non-severe during the relevant time period.

**B.      Subjective Complaints and Credibility Analysis:**

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

In her decision, the ALJ stated that Plaintiff's medically determinable impairment could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent

they were inconsistent with the ALJ's RFC assessment.  The ALJ discussed Plaintiff's daily activities: he takes his child to daycare, sweeps, vacuums the home, does the dishes, does the laundry, cleans the home, walks, drives the car, and shops in stores.  Although Plaintiff complained of constant pain, he only took Ibuprofen, 800 mg. for pain.  Failure to seek regular treatment or obtain pain medication has been found to be inconsistent with complaints of disabling pain.  Comstock v. Chater, 91 F.3d 1143, 1147(8th Cir. 1996), citing Benskin v. Bowen, 830 F.2d 878, 884 (8th Cir. 1987).

The Court finds there is substantial evidence to support the ALJ's credibility findings.

**C.     Residual Functional Capacity Assessment:**

RFC is the most a person can do despite that person's limitations.   20 C.F.R. §404.1545(a)(1).  It is assessed using all relevant evidence in the record.  Id.  This includes medical records, observations of treating physicians and others, and the claimant's own description of his limitations.  Guilliams, 393 F.3d at 801;  Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question."  Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace."  Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).  "The ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC."  Id.

The ALJ found that Plaintiff had the RFC to perform less than the full range of light work as defined in 20 CFR 404.1567(b) except that he "can do no climbing of ladders, ramps and

scaffolds and only occasionally can climb ramps, stairs, balance, stoop, kneel, crouch, and crawl. Additionally, the claimant only frequently can push and pull with the lower left extremity."

Plaintiff argues that the ALJ "completely disregarded Mr. Baker's testimony regarding his pain and discomfort, as well as the findings and opinions of the treating physicians." (Doc. 13 at p. 17).  As stated above, the ALJ did, in fact, discuss Plaintiff's testimony regarding his pain and discomfort.  In fact, she stated that pain and discomfort were not necessarily disabling and that the mere inability to work without some degree of pain or discomfort, of a minimal to mild nature, did not necessarily constitute a disability for Social Security purposes.  See Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991).  In addition, the ALJ noted that after Dr. Routsong performed nerve decompression surgery, Dr. Routsong reported that Plaintiff no longer had radicular pain or numbness.  Although Plaintiff still reported pain in the left sacroiliac joint and occasionally in the hamstring region, he refused to take the Lyrica that Dr. Routsong gave him, or any other pain medication besides Ibuprofen.

Dr. Takach, who completed a Physical RFC Assessment on November 19, 2008, found that Plaintiff could perform light work except that he could occasionally climb ramp/stairs/ladder/rope/scaffolds, balance, stoop, kneel, crouch and crawl and should avoid concentrated exposure to hazards (machinery, heights, etc.).  Finally, Mr. Dahlke found Plaintiff could do medium work.  The ALJ gave only some weight to Mr. Dahlke's opinion, finding that it was optimistic in light of Plaintiff's allegations of pain, her assessment of Plaintiff's credibility and other findings for which she crafted a more appropriate functional assessment relative to limitations.

The Court believes there is substantial evidence to support the ALJ's RFC assessment.

-20-

**D.      Hypothetical Question to VE:**

The ALJ posed the following hypothetical question to the VE:

If you will please consider an ROC [sic] for an individual capable of full range of light work with no climbing of ladders, ropes and scaffolding, only occasional ramps and stairs, occasional balance, [INAUDIBLE],crawl, and only frequent pushing and pulling of the lower left extremity, would that ROC [sic] be in conformity with past work either as performed or is [sic] generally found in the national economy?
A: He could not, Judge.
Q: All right.  Would you please consider a hypothetical claimant with the same vocational profile and ROC [sic], are there any occupations that such an individual could perform?
A: There are Judge.  There would be transferrable skills to the light levels so they would be light and unskilled jobs.
Q. There are no transferrable skills?
A: Not to the light level.
A: Okay.
A: There is work available as a cashier, which would be light and unskilled work. ...There is also work available in housekeeping.  This again would be light and unskilled. ...There is also work available as a hand packager which again is light and unskilled work. ...

(Tr. 69-70).

The Court believes the hypothetical questions the ALJ proposed to the VE fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole.  See Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).  The Court further believes that the VE's responses to these hypothetical questions constitute substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude him from performing light work with certain limitations as a cashier, housekeeper, or hand packager.  Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996)(testimony from VE based on properly phrased hypothetical question constitutes substantial evidence).

AO72A
(Rev. 8/82)

**V.      Conclusion:**

Accordingly, the Court hereby affirms the ALJ's decision and dismisses Plaintiff's case with prejudice.

DATED this 6th  day of March, 2012.


/s/ *Erin L. Setser*

HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-22-